UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

S&S INNOVATIONS CORP.,
a Colorado Corporation,

      Plaintiff,

v.

UUSI, LLC, d/b/a Nartron, a Michigan
Limited Liability Company, TATTLER
HOME PRODUCTS, LLC, a Michigan
Limited Liability Company, and NORMAN
RAUTIOLA, an individual.

      Defendants.

Case No. 18-cv-01377

Honorable Hala Y. Jarbou

Magistrate Phillip J. Green

**PLAINTIFF'S BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

---

## **PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## **INTRODUCTION**

    S&S Innovations Corp. is the owner of several intellectual property rights.  These include two federal trademark registrations, common law trademark rights to those marks, and a federal copyright registration related to its website and the photographs and content therein.  There is no genuine issue of material fact that Defendants have violated these rights.  In fact, Defendants admitted that they have infringed, and continue to infringe, on Plaintiff's rights.  This is further confirmed through the court record of another lawsuit in which Defendant Norman Rautiola repeatedly testified regarding the efforts he took to gain access to S&S's assets, including intellectual property, and he then used these very assets to directly compete with S&S.

    Based on Defendants' admissions in this case, and all documents produced by S&S, there is no further factual development necessary to resolve the issues of liability.  Defendants are liable under all counts of Plaintiff's First Amended Complaint [ECF No. 32].  This Court should grant Plaintiff's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.

## UNDISPUTED FACTS THAT ESTABLISH LIABILITY AS TO ALL DEFENDANTS

On June 16, 2020, Plaintiff served Defendants with a series of Requests for Admission. [ECF No. 36].  *Exhibit 1*.  The requests were directed at the fundamental issues of liability in this case with respect to all counts of Plaintiff's First Amended Complaint.  Specifically, and among many other issues, S&S requested that Defendants admit that they "continue to use the Tattler trademark in the course of its business" and that Defendants "do not have consent of S&S Innovations Corp. to use the Tattler trademark."  Defendants were also requested to admit that they have infringed on Plaintiff's copyright protections.  Defendants did not respond to these, or any of the Requests for Admission.  As a result, Defendants admitted to violating Plaintiff's intellectual property rights, admitted that they do not have S&S's consent to use the trademarks or copyright, and made numerous other admissions that are dispositive of the issues presented in this case.  Accordingly, the Court should grant Plaintiff's Motion for Summary Judgment.

## STATEMENT OF FACTS

*1.  Plaintiff's Intellectual Property.*

In 1976 Loren Stieg ("Loren") invented, designed, and began manufacturing reusable canning lids.  At all times, Loren conducted his business using the trade name "Tattler" and "Tattler Reusable Canning Lids," which over the course of decades developed significant goodwill and market identification related to the sale of reusable canning lids.

In 2010, Loren brought his son Brad Stieg into the fold.  Together, they formed S&S Innovations Corp. ("S&S" or the "Company").  Loren maintained a 51% interest in the Company, and Brad held a 49% interest.  The business was largely relocated to Colorado where Brad lived and where day-to-day business operations continued.

On December 22, 2010, S&S filed its application for federal registration of the Tattler logo (below) for use in connection with the production and sale of "plastic lids."  On August 2, 2011, the United States Patent and Trademark Office registered the Tattler logo with S&S Innovations, Corp. as the owner of Registration No. 4005734.  *Exhibit 2*.



The Tattler logo is prominently displayed on the S&S website located at https://reuseablecanninglids.com.  The Tattler logo is also featured on most of the Company's products, packaging, listings, and platforms.  *Exhibit 3*.  Loren has made use of the Tattler logo in commerce since at least 1976.

On November 27, 2018, S&S filed a federal trademark application with the USPTO for "TATTLER" used in connection with "plastic lids."  On June 25, 2019, the USPTO approved the application as Registration No. 5,787,373.  *Exhibit 4*.

On December 5, 2018, S&S filed its application for copyright protection of its website. Specifically, the title of work related to the application was the "Tattler Reusable Canning Lids Website".  With an effective date of December 5, 2018, the S&S website was registered with the United States Copyright Office, registration number TXu 2-115-949.  *Exhibit 5*.  S&S is the owner of this work and exclusively holds all rights to the website and its contents (including text and images).

In addition to the formal registrations held by S&S, the Company holds common law trademark rights in the Tattler name and logo.  Dating back to the 1970s, Loren used the "TATTLER" mark and logo in commerce related to the manufacture and sale of reusable canning

lids. This is confirmed through various newspaper articles at that time which discussed his invention and the launch of his business. *Exhibit 6*. Since 2010, the Company has now used those same marks in connection with the manufacture and sale of reusable canning lids. The "TATTLER" mark is displayed prominently on the product itself, as well as throughout product packaging and online advertising via S&S's website.

2. *Norman Rautiola, through his company Nartron, entered into a Stock Purchase Agreement with Loren Stieg only to gain access to S&S Innovations Corp's intellectual property, not to conduct business with Mr. Stieg.*

Loren's partnership with his son Brad lasted until 2014. For various reasons, Loren agreed to purchase Brad's minority interest in the Company and assume 100% ownership of S&S. However, Loren required additional financing to complete the transaction. Loren identified Defendant Norman Rautiola ("Rautiola") as a suitable investor, and Mr. Rautiola ultimately agreed to purchase a minority interest in the Company.

On March 3, 2014, Loren and Mr. Rautiola struck a deal for Mr. Rautiola's company UUSI, LLC d/b/a Nartron (hereinafter "Nartron") to purchase a minority interest in S&S. This was documented through execution of a Stock Purchase Agreement ("SPA"). *Exhibit 7*. The SPA confirms that Nartron holds only a minority interest in S&S. This was later confirmed in other legal proceedings between Loren and Mr. Rautiola. *Exhibit 8*. There is no dispute that Loren possesses sole control over S&S property and assets.

The terms of the SPA state that "the entire operation known as S&S INNOVATIONS (a/k/a "Tattler Reusable Canning Lids") shall be moved from its present location in Colorado, to the Nartron facilities located north of Reed City, Michigan, where production and related operations shall be continued." *Exhibit 7, ¶ 4*. This provision, along with every other provision of the SPA, gave Mr. Rautiola no authority to create his own separate business that directly infringes on S&S's

rights by selling counterfeit reusable canning lids.  Nonetheless, Mr. Rautiola used the SPA as a vehicle to gain access to S&S assets, rather than conducting business for the betterment of the Company.

Almost immediately upon becoming a minority owner, Mr. Rautiola engaged in a series of unlawful, secretive, and underhanded maneuvers to harm S&S, including the blatant misuse of the Company's intellectual property rights, and simply dared Loren to fight back.   Initially, the conflict between Loren and Mr. Rautiola resulted in a lawsuit in Osceola County Circuit Court, Case No: 16-14662-CK, *UUSI, LLC v Stieg, et al*.  Among other matters, the parties disputed who (Loren or Nartron) held a majority interest in S&S.  This case resulted in a judicial determination that Loren is the majority owner of S&S.  *Exhibit 8*.  With the issue of majority ownership resolved, the issue of Plaintiff's damages related to Defendants' intentional and willful infringement on the Company's protected intellectual property rights is now ripe.

3.  *March 2014 – Norman Rautiola began operation of a new company to compete with S&S that violates S&S's intellectual property.*

Following execution of the SPA, Loren set off for Colorado to buy-out Brad and collect all S&S property, materials, assets, and equipment.  Loren then transported everything back across the country and delivered the entirety of the S&S business to the Nartron premises, for operation purposes only.  This included, among other items, the raw materials, inventory, molds, molding machines, and client lists (with contact information).

On approximately March 21 or 22, 2014, Loren arrived back in Michigan with truckloads of S&S assets and materials.  Less than a week later, Mr. Rautiola already had asserted that he was the majority owner of S&S and proposed forming a new company named Tattler Home Products ("THP") and adding new products.  *Exhibit 9*.  In a letter to Loren dated March 27, 2014, Mr.

Rautiola even recommended that S&S transfer all assets to the new company -- THP.  *Exhibit 10*.

Loren was blindsided by Mr. Rautiola's proposal and flatly rejected the notion of a new company.

Regardless of Loren's opposition, Mr. Rautiola was already operating under THP.  In an

invoice dated ***March 27, 2014***, Mr. Rautiola was conducting business with S&S clients, not

through S&S, but through THP.  *Exhibit 11*.  Mr. Rautiola also opened a bank account for THP

and did not list Loren as an owner on the account, thus confirming the illegitimacy of this new

company.

Additionally, in a letter dated March 28, 2014, Mr. Rautiola, through one of his executive

team members, made serious misrepresentations to the S&S sales team regarding company

operations, including that Loren was no longer "in charge" of S&S and that a new company – THP

– had been formed to sell reusable canning lids.  *Exhibit 12*.  In addition, it stated that "Norman

Rautiola has assumed control of the prior operations and assets."  *Id*.  The March 28, 2014

correspondence further goes afoul by misrepresenting that THP is a "sister company."  This is

false.  THP is a hack and a direct violator of S&S intellectual property rights.

4.  *April 2014 – Norman Rautiola files Articles of Organization with the State of Michigan to form Tattler Home Products, excludes S&S Innovations from the business, and utilizes S&S equipment and intellectual property to compete with S&S.*

Into April 2014, the relationship between Mr. Rautiola and Loren only continued to sour.

As majority owner and having concern about S&S decreasing sales, Loren requested to review

corporate records now stored at Nartron.  In response, internal emails between Nartron employees

indicate that information was being intentionally withheld from Loren.  *Exhibit 13*.  Nartron

employees needed "direction on what can be given to him," indicating not only that information

was intentionally being withheld, but that the information was being withheld at the instruction of

Mr. Rautiola himself.  *Id*.  It is now apparent that S&S's sales were plummeting because a

counterfeit operation had been established to steal sales from S&S, and Nartron employees running the counterfeiter THP were involved in the unlawful enterprise along with Mr. Rautiola.

About a month after becoming a minority owner in S&S, Mr. Rautiola filed Articles of Organization with the State of Michigan to formally create Tattler Home Products, LLC. *Exhibit 14*. Mr. Rautiola even personally signed the Articles of Incorporation, which cements his personal and direct involvement in creating this new company. Mr. Rautiola's testimony regarding this entity is telling of his intentions with respect to Loren, S&S, and his efforts to unlawfully utilize S&S intellectual property.

At trial in the underlying litigation, Mr. Rautiola testified that he founded THP to sell reusable canning lids and excluded Loren from the business.

> Q:  Did you cause to be opened by March 27, a bank account at Huntington Bank,
> in Reed City, Michigan, an account under the name of Tattler Home Products?
> A:  I believe so.
> Q:  And was your name on that account?
> A:  Probably.
> Q:  **But, Mr. Stieg's name wasn't on the bank account was it?**
> A:  **No, he had nothing to do with Tattler Home Products.**
> Q:  **And, yet, they're selling the lids?**
> A:  **Selling lids, yes.**
> Q:  Thank you.
> A:  **Definitely selling lids**. *Exhibit 15, p 187.*  (Emphasis Added).

Not only had Mr. Rautiola formed a new, separate company to compete with S&S, and used S&S intellectual property in the same process, but Mr. Rautiola testified that THP produced its canning lids with the S&S materials and equipment that Loren relocated from Colorado to Michigan. Significantly, the molds used to create the lids contain the "TATTLER" trademark, resulting in a lid imprinted with S&S's federally-registered trademark. Product packaging for the lids also prominently display S&S's federally-registered Tattler trademark and Tattler logo. See,

*Exhibit 3*.  In other words, Mr. Rautiola undeniably admitted to intellectual property violations

through his operation of THP.

> Q:  Regarding production of the canning lids at the facility, are you still using the original equipment that was delivered from Colorado?
> A:  Yes.
> Q:  Has it been modified in any way?
> A:  I don't think so, but I don't know that.
> Q:  All right.  Who would know whether it's been modified?
> A:  I would typically know that.
> Q:  Okay.  And you don't know - -
> A:  But since I don't know everything that's going on out there with the mold operator and on and on and on, but in the normal course of business I would know that.
> **Q:  And as of this date you have not been informed in your normal course of business of any modification to that mold?**
> **A:  Now, you've specified the mold.  The answer is, yes, there have been no changes to the mold to best of my ability, nor to any other equipment that was delivered to us from S&S in Colorado.**
> **Q:  All right.  So basically the mold that's being used to produce the lids is the same condition, if you will, other than perhaps some wear and tear, now that it was when it was delivered from Colorado?**
> **A:  Yes.**  *Exhibit 16, p 67-68*.  (Emphasis Added).

5. *May 2014 – Defendants infringement on S&S trademarks continues despite demands to cease and desist.*

By May 2014, Mr. Rautiola's true intentions became apparent to Loren.  Mr. Rautiola was

intentionally acting to promote THP and to harm S&S.  S&S's sales plunged due to Defendants'

diversion of established corporate customers from S&S to THP.  Loren then attempted to take

action.  On May 4, 2014, Loren notified Mr. Rautiola's executive team that he would resume

management of the S&S email account.  At the time the email account was being controlled by

Nartron employees for the intended purposes of allowing them to operate S&S, but in reality they

were using it to channel S&S's customers into the THP pipeline.  *Exhibit 17*.

Further, on May 16, 2014 Loren met with Jim Smith, who was one of Mr. Rautiola's

managers and an employee of Nartron, and expressly stated his opposition to THP.  *Exhibit 18*.

Mr. Smith's notes from this meeting corroborate that Loren demanded that Defendants cease selling Tattler-branded product:

> Loren never approved the name change to Tattler Home Product[s]. NR purchased 49% of S&S Innovation[s] dba as Tattler. Loren had a copy of the new boxes with Tattler Home Product[s] and the Stieg name removed. Loren stated that we are not allowed to ship Tattler lids in a Tattler Home Product box.

> Loren stated that the new name was discussed with him and he thought was a good idea but he never officially agreed. Loren found out that the name had been trademarked by Heather with NR being the owner. Loren is upset that both names (Loren & NR) were not on the trademark. **Loren stated that Nartron was not allowed to ship Tattler lids in Tattler Home Product boxes since he (Loren) has 51% ownership control [of] the company.** *Id.* (Emphasis Added).

Despite Loren's demands, Mr. Rautiola had no intention to cooperate. On May 18, 2014, Loren demanded that S&S business operations, which were mostly being carried out by Nartron employees despite Loren's efforts to actively participate in his own business, be removed from the Nartron premises. *Exhibit 19.* On May 22, 2014, Mr. Rautiola ousted Loren from the Nartron premises and threatened police involvement if Loren stepped on Nartron property. *Exhibit 20.* Thus, Mr. Rautiola made it impossible for Loren to access and protect S&S's property, equipment, inventory, and materials.

6. *In the process of infringing on Plaintiff's trademark rights, Defendants infringed upon Plaintiff's copyright protection.*

In association with the sale of its reusable canning lids, S&S created and published its website located online at www.reusablecanninglids.com. This website was created and published before execution of the SPA, and long before any arrangement whatsoever between S&S and Nartron. The S&S website contains original and creative content, including the Tattler Logo, Tattler trademark, pictures, instructional videos, format, and text. These features were created by S&S for the express purpose of selling reusable canning lids online.

9

After Mr. Rautiola formed THP, he then personally directed THP to set up a website located at www.tattlerproducts.com.  This website contains nearly identical content (including pictures and text) and formatting as the S&S website.  Additionally, THP's website also prominently displays S&S's federally registered trademarks.  See, *infra*, *Exhibit 27*.



To this day, the THP website at www.tattlerproducts.com is active and displays the federally-registered trademarks owned by S&S.  A simple comparison between the two websites confirms the blatant infringement on the copyright held by S&S.

7. *Norman Rautiola and Tattler Home Products continue to violate S&S's intellectual property rights to this day.*

From 2014 to the present, Mr. Rautiola testified that Defendants have continuously infringed on Plaintiff's intellectual property.

> Q:  They're not being manufactured - - I'm using the word manufactured - - produced under the name of S&S Innovations, are they?
> A:  Ask me the question again, please.
> Q:  You continue to make the canning lids there at Nartron?
> A:  Yes.
> Q:  And you make them and are producing them under the name Tattler Home Products?
> A:  Yes.  *Exhibit 15, p 193*.

Critically, Mr. Rautiola testified that he hired additional workers to produce reusable canning lids to benefit THP, not S&S.  "There was nobody hired to take his [Loren] place or his wife's place.  But there were people hired to secure a purchase order on behalf of Tattler Home Products.  Big difference."  *Id*. at 267. Mr. Rautiola is correct in this regard – there is a very big

difference between sabotaging S&S and promoting his counterfeiting company that is infringing on S&S's intellectual property.

8. *Significant customer confusion occurred as a result of Defendants' violation of Plaintiff's intellectual property.*

Actual customer confusion began soon after Defendants initiated their crusade to sink S&S by stealing its intellectual property and informing customers that S&S no longer existed. The confusion was made possible because Mr. Rautiola and Nartron seized all S&S assets and equipment, including control over S&S email accounts, kicked Loren off of the Nartron premises, and produced counterfeit products under the Tattler trademark. Customers were confused on how to obtain orders that were never delivered, or simply how to get information.

Below are examples of the customer confusion that resulted from Defendant's unlawful conduct.

- May 2014 – Email exchange between Loren and customer. The customer ordered lids from THP in March 2014 and never received the order, and then contacted S&S about the unfulfilled order. *Exhibit 21*.

- June 25, 2014 – Email exchange between a customer looking to collect an outstanding balance and Nartron employee in control of S&S email account. In response to inquiry to collect, Nartron employee: "S&S Innovations Corp. shipments to Ace Hardware have been assumed by an entity using the name 'Tattler Home Products' who likely at this time do have invoices to cover this liability in that name." This is confusing because the customer is then uncertain of who to contact in order to collect on the bill. *Exhibit 22*.

- September 11, 2014 – Email exchange between Nartron employee and customer. In response to inquiry from customer, Nartron employee: "Since the lids you had were purchased in 2011 it was before the company was under new owners. In March of 2014 S&S Innovations was sold and is now Tattler Home Products." These are false misrepresentations to a customer regarding S&S, and resulted in the customer not knowing who to contact for reimbursement. *Exhibit 23*.

9. *Loren Stieg never consented to the formation of Tattler Home Products*.

Mr. Rautiola stole S&S's assets, including intellectual property, and repurposed them for

his own benefit.  This was accomplished by inducing Loren to bring all Company assets onto the Nartron premises and then permanently removing Loren from the building.  Mr. Rautiola then possessed all the inventory, equipment, materials, molds, and molding machines to carry on with his counterfeiting company, as well as S&S's customer lists and contact information which he used to steal those existing S&S customers by misrepresenting the nature of THP's affiliation and association with S&S.

As majority owner of S&S, Loren never agreed to the formation of THP or the use of S&S's trademarks or copyrighted material by THP.  In May 2014, Loren was perfectly clear:  "Loren stated that we are not allowed to ship Tattler lids in a Tattler Home Product box….Loren stated that Nartron was not allowed to ship Tattler lids in Tattler Home Product boxes since he (Loren) has 51% ownership control [of] the company."  *Exhibit 18*.  At trial in the previous matter, Loren testified similarly:

> Q:  However, Tattler Home was formed without you being a member.  It was Mr. Rautiola and Heather Huber, correct?
> A:  Correct.
> Q:  Did you ever agree to this?
> A:  No.  *Exhibit 24, p 163*.
>                                  ***
> Q:  Was any of this inventory given to you?  This is S&S inventory?
> A:  Every bit of it.
> Q:  This wasn't delivered to the new company, Tattler Home Products, this went to S&S?
> A:  Oh, it was S&S originally.
> Q:  Yeah.
> A:  But it was delivered to Tattler Home Products.
> Q:  Well, wait a minute.  It was S&S and it was delivered to Nartron?
> A:  Correct.
> Q:  Tattler Home Products then took possession of it?
> A:  Yes.
> ***Q:  Was that your permission to give it to Tattler Home Products?***
> ***A:  Absolutely not.***  *Id*. at 181.

In no uncertain terms, Loren is, and always has been, opposed to THP and Defendants' unlawful use of S&S intellectual property.  This is further supported by the fact that: (1) Mr. Rautiola specifically excluded him from the THP Articles of Organization filed with the State of Michigan (along with all subsequent filings); (2) Mr. Rautiola excluded Loren from the THP bank account; and (3) Mr. Rautiola kicked Loren out of the Nartron premises where all S&S equipment, materials, and client lists are located.

      10.    *Procedural History*.

As mentioned above, Mr. Rautiola and Loren were previously at odds in a lawsuit involving, among other things, majority ownership of S&S.  On the one hand, Loren took the position that he owned 51% of S&S pursuant to the SPA.  On the other hand, Mr. Rautiola alleged that he owned 66% of S&S by virtue of a roughly $170,000 payment he made to clear Company debt in order for Loren to gain possession of the S&S equipment.

In light of the uncertainty as to majority ownership, and who ultimately had rights to represent the best interests of S&S, the parties agreed on two separate occasions that no one (and no other entity) had standing to assert rights on behalf of S&S until the issue of majority ownership was resolved.  *Exhibits 25 and 26*.  Significantly, Attorney Kenneth Morgan, counsel for Defendants in this action, was attorney of record for the plaintiff in the federal case, *Exhibit 25*. These stipulations quickly dispel any argument by Defendants that S&S could, or should have, previously raised the intellectual property claims in that prior action.  Already embroiled in a complex state-court proceeding with an inevitable trial on the horizon, the Company was in no position to then raise federal intellectual property claims against Defendants.  But with the issue of majority ownership resolved, the federal intellectual property claims are now properly before this Court.

## FED. R. CIV. P. 56 STANDARD

Summary judgment is appropriate only when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## LAW AND ARGUMENT

### I. DEFENDANTS ADMITTED TO TRADEMARK AND COPYRIGHT INFRINGEMENT.

On June 16, 2020, S&S served Defendants with an exhaustive list of Requests for Admissions. *Exhibit 1*. Without quoting the discovery requests at-length, the requests sought admissions that Defendants used the S&S Tattler logo and Tattler trademark in the course of creating a competing company and selling identical, counterfeit products through the use of S&S equipment and materials. *Id*. at ¶¶ 7-19. It was further requested that Defendants admit that they never had S&S's consent to use the Tattler logo and Tattler trademark. *Id*. at ¶¶ 20-21; 24-26. Moreover, it was requested that Defendants admit that they created a nearly carbon-copy version of the S&S website (while also using the Tattler logo and trademark) and did not have consent to do so. *Id*. at ¶¶ 27-30; 33. Defendants did not respond to Plaintiff's discovery.[1]

Under the Federal Rules of Civil Procedure, a party served with Requests for Admission has 30 days to respond. Fed. R. Civ. Pro. 36(a)(3). The requests are automatically deemed admitted if the opposing party does not respond within 30 days: "A matter is admitted unless,

---

[1] Answers to Plaintiff's discovery were due July 16, 2020. Defendants attempted to submit responses a day late on July 17, 2020. However, not only were the answers late, but Defendants attempted to serve the answers by filing them through the CM / ECF system, in violation of Fed. R. Civ. Pro. 5(d)(1)(A). *See also*, ECF No. 42. Thus, Defendants never filed answers to Plaintiff's discovery requests and have not filed a motion to set aside the admissions.

within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney." *Id*.  No motion to establish or affirm the admissions is required.  *Shell v. Lautenschlager*, No. 1:15CV1757, 2017 U.S. Dist. LEXIS 180596, 2017 WL 4919206, at *4 (N.D. Ohio Oct. 31, 2017) (citing, *Goodson v. Brennan*, 688 F. App'x 372, 375 (6th Cir. 2017)).  Additionally, all admissions are conclusively established as facts.  Fed. R. Civ. Pro. 36(b).

Here, Defendants did not respond to Plaintiff's Requests for Admission.  Each request is therefore admitted and dispositive of the factual and legal issues before the Court.  The following facts are now conclusively established:  (1) Defendants used (and continue to use) Plaintiff's intellectual property; (2) Plaintiff has objected to Defendants' use of its intellectual property; (3) Defendants have no legal right to use Plaintiff's intellectual property; (4) Plaintiff never otherwise consented to the use of its intellectual property; (5) Defendants have created and sold counterfeit S&S products that contain S&S intellectual property; (6) Defendants unlawfully copied the S&S website in creating their website; (7) Defendants have used (and continue to use) S&S intellectual property in commerce; and (8) Defendants have directly competed with S&S using intellectual property owned by S&S.

As a result, there is no genuine issue of material fact that Defendants are liable as a matter of law to S&S with respect to Counts I – V of Plaintiff's First Amended Complaint.  This Court should grant Plaintiff's motion on this basis alone.

## II.    TATTLER HOME PRODUCTS, LLC IS A DIRECT INFRINGER ON PLAINTIFF'S INTELLECTUAL PROPERTY RIGHTS AND NORMAN RAUTIOLA AND UUSI, LLC ARE CONTRIBUTORY OFFENDERS.

Plaintiff asserts numerous claims against Defendant under the Lanham Act.  There are two methods for showing liability under the Act: direct infringement and contributory liability.  The

former is the hallmark of the usual trademark case, in which "the defendant is using a mark to identify its goods that is similar to the plaintiff's trademark." *Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 695 (6th Cir. 2003). The latter allows for contributory liability against a defendant who has knowingly facilitated the direct infringement of another. See, *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 505 (6th Cir. 2013).

### 1. Direct Infringer - THP.

Defendant THP is a direct infringer on Plaintiff's intellectual property rights. For starters, the name of the company unlawfully uses the Tattler mark. THP also manufactures and sells counterfeit lids using equipment owned by S&S. This equipment contains molds that have the Tattler mark imprinted on them, resulting in lids bearing S&S's federally-registered trademark integrally molded onto every lid produced. THP also utilizes packaging which includes the Tattler logo and mark. Simply, almost every business activity performed by THP results in an intellectual property violation because it was formed by Mr. Rautiola for this very purpose. Thus, THP is a direct infringer.

### 2. Contributory Infringers - Norman Rautiola and Nartron.

Mr. Rautiola is jointly and severally liable for the infringement on behalf of Nartron and THP. Corporate officers that "directly participated in and authorized the infringement" or "actively" participated in the selection and use of the infringing marks can be held individually liable for corporate infringement. See, *Griff Machine Products Co. v. Griptron Systems, Inc.,* 1985 U.S. Dist. LEXIS 18462 (N.D. Ohio June 27, 1985); *Hair Associates, Inc. v. National Hair Replacement Services, Inc.* 987 F. Supp. 569 (W.D. Mich. 1997).

In this case, Mr. Rautiola was the mastermind behind the unlawful conduct. He individually negotiated with Loren to obtain a minority ownership interest in S&S. He used this

minority interest to gain access to S&S assets, including its intellectual property (molding machines which contain S&S's Tattler mark imprint, packaging supplies with the Tattler logo and mark, etc.).  Mr. Rautiola then directed his staff to withhold information from Loren, permanently removed Loren from the Nartron premises where all S&S assets and equipment were located, personally created THP to directly compete with S&S, and created a bank account for the infringing company that excluded Loren.  To make matters worse, and to intentionally create consumer confusion, the new competing business's name even contains the Tattler mark.  Mr. Rautiola's personal involvement in the intellectual property violations cannot be denied, and he is personally liable as a result as a contributory infringer.

Likewise, Defendant Uusi, LLC d/b/a Nartron is a contributory infringer.  Narton is the party that contracted with Loren through the SPA (at the direction of Mr. Rautiola).  Narton is where the S&S assets were placed after relocation from Colorado.  Thereafter, Nartron employees manufactured the infringing products because THP has no employees of its own.  Mr. Rautiola testified at-length regarding the involvement of Nartron in the sale of canning lids:

> Q:     So individuals who were employed by Nartron were involved in the manufacture of the lids is what you're saying; is that correct?
> A:     Yes.
> Q:     Were their wages paid by Nartron?
> A:     Yes.
> Q:     Do you have any idea how many individuals were manufacturing those - - involved in the manufacturing of the lids?
> A:     No.
> Q:     And when I say "manufacture," I'm talking about the actual physical creation of those items.  Is that - -
> A:     Yes; I understand that.
> Q:     In 2016 were any Tattler Home Products - - individuals employed by Tattler Home Products manufacturing those lids?
> A:     No.
> Q:     And were those Nartron employees again?
> A:     Nartron employees would be operating the molding machines and would perform the packaging and shipping operations.  *Exhibit 16, p 11*.

Further, Nartron employees were participating in the scheme to derail S&S, while promoting THP.   See, *Exhibit 12* (Letter on Nartron letterhead from Nartron employee to S&S sales member that S&S "no longer operates as before since that primary business has been sold to a new entity in Michigan."); *Exhibit 13* (Narton employees internally discussing what information should be withheld from Loren.); *Exhibit 18* (Letter on Nartron letterhead that documents the meeting between Nartron employee (Jim Smith) and Loren regarding Loren's objection to THP); *Exhibits 21-23* (Nartron employees misleading S&S customers regarding the sale of S&S to THP).

Accordingly, THP, Mr. Rautiola, and Nartron are all properly liable for infringing on the intellectual property rights of S&S.

## III.   THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT DEFENDANTS ARE LIABLE FOR TRADEMARK INFRINGEMENT.

The Lanham Act provides that owners of registered marks may pursue claims of trademark infringement pursuant to 15 U.S.C. § 1114. "The touchstone of liability [for trademark infringement] is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).

In determining whether a likelihood of confusion exists, a court will typically weigh the following eight factors: (1) strength of the senior mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) the intent of defendant in selecting the mark; and (8) likelihood of expansion of the product lines. *Id.* (citing *Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982)).  Not all of these factors will be relevant in every case, and in the course of applying them, "the ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some

18

way." *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991). "A party claiming infringement need not show all, or even most, of these factors in order to prevail." *Esercizio v. Roberts*, 944 F.2d 1235, 1242 (6th Cir. 1991).

### a.  *Strength of S&S Innovations Corp.'s trademarks.*

This factor focuses on the distinctiveness of a mark and its recognition among the public. *Homeowners Group*, 931 F.2d at 1107 (explaining that "[a] mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source") (internal quotation marks and citation omitted); *Daddy's Junky Music Stores*, 109 F.3d at 280 ("The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, the more protection it is due.") (citation omitted).  Generally, the strength of a mark is the result of its unique nature, its owner's intensive advertising efforts, or both.  *Daddy's Junky Music Stores*, 109 F.3d at 280 (noting that public acceptance of a mark "can occur when the mark is unique, when it has received intensive advertisement, or both") (citation omitted).

As explained by the Sixth Circuit, the strength evaluation encompasses two separate components: "(1) 'conceptual strength,' or 'placement of the mark on the spectrum of marks,' which encapsulates the question of inherent distinctiveness; and (2) 'commercial strength' or 'the marketplace recognition value of the mark.'"  *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012) (quoting 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11.83 (4th ed.)).

> *1.  Plaintiff's federally registered trademarks are entitled to the highest level of conceptual strength because they are fanciful marks.*

A mark's distinctiveness and resulting conceptual strength "depends partly upon which of four categories it occupies: generic, descriptive, suggestive, and fanciful or arbitrary." *Therma-Scan Inc v Thermoscan, Inc*, 295 F.3d 623, 631 (6th Cir. 2002).  (Internal Quotations Omitted).

19

"Suggestive, arbitrary and fanciful marks are inherently distinctive and are protectable so long as the putative owner has actually used the mark." *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 761-62 (6th Cir. 2005). Fanciful and arbitrary trademarks enjoy the strongest protection. *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1117 (6th Cir. 1996). "An 'arbitrary' mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached, such as CAMEL cigarettes or APPLE computers." *Id.* "A 'fanciful' mark is a combination of letters or other symbols signifying nothing other than the product or service to which the mark has been assigned, such as EXXON or KODAK." *Id.*

Here, the Tattler logo and mark are at a minimum arbitrary, but most likely fanciful in nature. Established definitions of "tattler" include a person who tattles or gossips about another, or a bird species which is a type of migratory sandpiper. Therefore the mark is arbitrary if it is considered to be a reference to either of these definitions, although S&S does not market its canning lids in a manner that evokes either of these definitions.

More likely the mark "Tattler" is a fanciful or coined mark. According to a 1976 newspaper article about Loren Stieg's creation of his reusable canning lids and the trademark, "Stieg is calling his product the 'Tattler' - after the loud snap they make when they seal." *Exhibit 6*. Therefore, "Tattler" is a name that Loren coined for his reusable canning lids nearly 45 years ago. Along the way, Loren (and then S&S) made repeated use of the Tattler logo and mark exclusively in association with the sale of reusable canning lids.

> 2. *Plaintiff's federally registered trademarks are entitled to the highest level of commercial strength because they possess great marketplace recognition for the sale of reusable canning lids.*

"A mark's commercial strength depends on public recognition, or the extent to which people associate the mark with the product it announces." *Progressive Distribution Servs v UPS, Inc*, 856 F.3d 416, 430 (6th Cir. 2017), citing *Maker's Mark*, 679 F.3d at 419. Dating back to 1976, Loren, and then later S&S, utilized the Tattler Logo and Tattler trademark exclusively in association with the sale of reusable canning lids. Over the course of 40 years before execution of the PSA, the Tattler brand and reusable canning lids were one-in-the-same. See, *Exhibit 6*. As a result, given the inextricable relationship between the word "Tattler" and reusable canning lids, the Tattler logo and Tattler mark have established substantial market recognition and are entitled to the highest level of protection.

Apart from the obvious common law protection, S&S's trademarks were federally registered dating back to August 2011 when the Tattler logo was registered with the USPTO. Under such circumstances, the Sixth Circuit has said that a trademark enjoys a strong presumption of recognition in the general population and is worthy of full protection. *Wynn Oil Co. v. Thomas*, 839 F.3d 1183, 1187 (6th Cir. 1988) ("[O]nce a mark has been registered for five years, the mark must be considered strong and worthy of full protection."). This factor clearly favors of S&S.

### b. *Relatedness of the good or services.*

The Sixth Circuit has identified three categories regarding the relatedness of the goods or services with which trademarks are associated:

> First, if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar; second, if the goods or services are somewhat related but not competitive, the likelihood of confusion will turn on other factors; third, if the goods or services are totally unrelated, confusion is unlikely. *Daddy's Junky Music Stores*, 109 F.3d at 282.

"The relatedness inquiry therefore focuses on whether goods or services with comparable marks that are similarly marketed and appeal to common customers are likely to lead consumers

21

to believe that they 'come from the same source, or are somehow connected with or sponsored by a common company.'" *Homeowners Group*, 931 F.2d at 1109.

In this case, the first category of relatedness applies because Defendants have positioned themselves to produce counterfeit products to those lawfully created by Plaintiff, use Plaintiff's packaging containing the Tattler logo and mark, and have otherwise attempted to make an identical business to that of Plaintiff.  Because of the copy-cat nature of Defendants' business, confusion is all but a certainty.  This factor weighs heavily in favor of Plaintiff.

### c. *Similarity of the marks.*

Under this analysis, the relevant inquiry is whether a particular trademark, when viewed alone, would lead to uncertainty about the goods or services that it identifies.  *Daddy's Junky Music Stores*, 109 F.3d at 283 (noting that "courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark") (internal quotation marks and citation omitted); *see also Homeowners Group*, 931 F.2d at 1109 ("A court must determine, in the light of what occurs in the marketplace, whether the mark will be confusing to the public when singly presented.") (internal quotation marks and citation omitted).  As such, a detailed analysis of specific features of a trademark is not appropriate; rather, "courts must view marks in their entirety and focus on their overall impressions, not individual features." *Daddy's Junky Music Stores*, 109 F.3d at 283.

Once again, the marks used by the Plaintiff and Defendants are identical, and there is no dispute that this factor supports granting summary judgment for S&S.  The defendants make use of not only the "Tattler" trademark, but also use the Plaintiff's entire logo.  In fact, a comparison

of the S&S website and the THP website shows the only difference between the logos is that THP's website has removed the "Stieg" name from next to the logo.  This factor also very heavily favors the plaintiff.

### d. *Evidence of actual confusion.*

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Daddy's Junky Music Stores*, 109 F.3d at 284 (citation omitted).  "Due to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant, and the factor of actual confusion "is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available." *Id*. (Internal Citations Omitted).

In this case, there is evidence of actual confusion in the form of customers confused as to the source of the reusable canning lids purchased from Defendants.  For example, in response to a customer inquiry Defendants received in September 2014, the customer (thinking she was contacting S&S) was told, "Since the lids you had were purchased in 2011 it was before the company was under new owners.  In March of 2014 S&S Innovations was sold and is now Tattler Home Products." *Exhibit 21*.  Defendants' statement that S&S was sold and is now Tattler Home Products is completely false, and it only served to create further actual confusion moving forward. This also shows that Defendants were intentionally taking action to create actual source confusion. Defendants were in a position to mislead the customer because they had assumed client lists, client contact information, and communication channels (email addresses and phone numbers) previously employed by S&S before March 2014.

Additionally, Defendants caused similar confusion with S&S's vendors and corporate distributors.  On at least two separate occasions, Defendants made false statements that S&S was

sold to another entity, *Exhibit 22*, and that S&S business had "been assumed by an entity using the name 'Tattler Home Products'", *Exhibit 23*. It is clear that customers did not know who to contact for help with their products and that others were equally misled about where they could obtain assistance. Once again, this factor weighs in favor of Plaintiff.

### e. *Marketing Channels Used.*

The fifth factor requires an analysis of the parties' predominant customers and their marketing approaches. *Homeowners Group*, 931 F.2d at 1110 (noting that this factor "consists of considerations of how and to whom the respective goods or services of the parties are sold"). Where the parties have different customers and market their goods or services in different ways, the likelihood of confusion decreases. *Id.* (explaining that dissimilarities between the parties' customers and their methods of marketing their products reduces the likelihood of confusion). This factor becomes particularly important where the other factors are not helpful, because it "is very significant in illuminating what actually happens in the marketplace." *Id.*

This factor clearly favors of S&S. Through Defendants' underhanded tactics of inducing Loren to bring the entire S&S business (including equipment, molds, molding machines, and inventory) into Nartron's facility and then banning him from the premises, Defendants obtained all of S&S's client lists, market materials, and email accounts. Defendants contacted S&S's clients directly through former channels previously employed by S&S (such as using the official S&S email accounts). There is no question that Defendants sold reusable canning lids identical to those produced by S&S, sold the counterfeit lids to S&S's customers, and used S&S's intellectual property, equipment, and inventory in the process of doing so. All of this was accomplished using the exact same marketing channels as S&S, thus this factor supports liability against Defendants.

### f.  *Likely degree of purchaser care.*

"With respect to an ordinary buyer, the standard for determining whether he or she would differentiate between products with similar trademarks is the exercise of ordinary caution. A higher degree of care, in contrast, is appropriate where the buyer in question has a particular expertise or sophistication, or is making an expensive or unusual purchase." *Therma-Scan, Inc*, 295 F.3d at 636-637; *Homeowners Group*, 931 F.2d at 1111 (differentiating between the appropriate standards of care for ordinary and sophisticated buyers). This expectation of greater attention, where appropriate, diminishes the likelihood of confusion. *Id*. Conversely, "[c]ourts have adopted the general proposition that the average customer is likely not to exercise a high degree of care in purchasing relatively inexpensive and fungible products…." *Gray v Meijer, Inc*, 295 F3d 641, 651 (6th Cir. 2002).

In this case, the goods sold are relatively inexpensive consumer products costing $10.00 or less for a box of one dozen canning lids. Consumers will use a low degree of purchaser care for inexpensive goods, and thus this factor also favors Plaintiff.

### g.  *Defendants' intent in selecting its mark.*

If a party chooses a mark with the intention of creating confusion between its products and those of another company, "that fact alone may be sufficient to justify an inference of confusing similarity." *Daddy's Junky Music Stores*, 109 F.3d at 286. (Citation Omitted).

Circumstantial evidence of copying, particularly "the use of a contested mark with knowledge of the protected mark at issue," is sufficient to support an inference of intentional infringement where direct evidence is not available. *Id.*; *See Champions Golf Club, Inc.*, 78 F.3d at 1121 (instructing the district court to evaluate the credibility of one of the defendant's former employees, who testified that he had told the defendant's owner about the prior use of the mark by

the plaintiff). Where there is no evidence that the defendant actually knew that a protected trademark existed, such knowledge can be presumed if evidence exists of the plaintiff's "extensive advertising and long-term use of a protected mark." *Daddy's Junky Music Stores*, 109 F.3d at 286.

Here, Defendants intentionally selected the Plaintiff's exact trademarks as part of a larger plan to damage Plaintiff in the marketplace.  Defendants used S&S's inventory and packaging that came back from Colorado bearing the Tattler Logo and Tattle trademark in furtherance of the Tattler Home Products business.  This is yet another factor that undoubtedly favors liability against Defendants because intentional use of another's mark is "sufficient to justify an inference of confusing similarity." *Daddy's Junky Music Stores*, 109 F.3d at 286.

### h. *Likelihood that product lines will expand.*

"[A] 'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Daddy's Junky Music Stores, Inc*, 109 F.3d at 287; *Homeowners Group*, 931 F.2d at 1112 (citing Restatement of Torts § 731(b) & comment c (1938)).  A geographic expansion or an increase in the types of products or services offered can be relevant.  *Homeowners Group*, 931 F.2d at 111.

In this case, Defendants already unlawfully compete with S&S by marketing and selling the same product to the same customers.  But even more so, Defendants have indicated a desire to expand their product line under the infringing mark, which would create an unfair roadblock to S&S's own legitimate expansion into those products using its own trademarks.  For example, in notes written and signed by Mr. Rautiola and dated March 26, 2014, he stated a desire to "add other home kitchen products." *Exhibit 9.*  In addition, THP's Articles of Incorporation filed with the state of Michigan state that the purpose for which it is formed is the "sale and manufacture of

kitchen products." *Exhibit 14.* Furthermore, under COVID-19 conditions, people may be more inclined to stay home and store food for a later date. As a result, either Plaintiff or Defendants may find opportunity in the marketplace to expand their footprint in the canning industry by using reusable canning lids as a foundational product. As a result, this factor also weighs in favor of Plaintiff.

In sum, each of the *Frisch* factors heavily favor S&S. The Company is entitled to Summary Judgment against all Defendants for trademark infringement.

## IV.     DEFENDANTS ARE LIABLE FOR UNFAIR COMPETITION UNDER COUNT II OF PLAINTIFF'S FIRST AMENDED COMPLAINT.

Civil liability for unfair competition under the Lanham Act arises when:

Any person who, in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person. 15 U.S.C. § 1125(a)(1)(A).

This provision makes illegal a broad array of rather amorphous practices that are commonly identified as "unfair competition." See, *Parameter Driven Software, Inc. v. Mass. Bay Ins. Co.*, 25 F.3d 332, 336-37 (6th Cir. 1994). Section 1125 differs from the federal trademark infringement statute to the extent that it extends protection to ***unregistered*** marks. See, *Sovereign Order of Saint John v Grady*, 119 F3d 1236, 1242 (6th Cir. 1997).

A false designation of origin violation under 15 U.S.C. § 1125(a)(1)(A) is established by proving (1) ownership of a specific trademark in connection with specific goods; (2) continuous use of the trademark; (3) establishing secondary meaning if the mark is descriptive; and (4) a likelihood of confusion amongst customers due to contemporaneous use of the parties' trademarks

in connection with the parties' respective goods.  See, *Allard Enters. v. Advanced Programming Res., Inc.*, 146 F.3d (6th Cir. 1998).

With respect to the first element, it is a bedrock principle of trademark law that trademark "ownership is not acquired by federal or state registration.  Rather, ownership rights flow only from prior appropriation and actual use in the market."  *Homeowner's Group, Inc.*, 931 F.2d at 1105.  In this case, at least as early as 1976 Loren coined and adopted the fanciful mark "TATTLER" in connection with the sale of reusable canning lids that he invented.  Regarding the second element, beginning in 2010 - and ***continuously*** since that time - S&S (with Loren as majority owner) has used that same trademark in commerce in connection with the sale of those same reusable canning lids.  Thus, at a minimum it is indisputable that S&S owned, and had been continuously using, a trademark in the Tattler mark and logo prior to any use of those same marks by Defendants.

As to the third element, it has been argued above that the Tattler mark and logo are fanciful marks (i.e., they are not descriptive), and as such, they are inherently distinctive and a showing of secondary meaning is not required.

Lastly, the likelihood of confusion test under 15 U.S.C. § 1125(a)(1)(A) is the same 8-factor likelihood of confusion test under 15 U.S.C. § 1114 which was applied above.  Accordingly, it has been established that there is a likelihood of confusion between S&S's trademarks and those used by the Defendants.  Moreover, for all the reasons stated above, there is ample evidence that Defendants' deceptive actions created a false designation of origin as to the reusable canning lids sold by Defendants, which resulted in customer confusion as to whether customers thought they were purchasing products from S&S (as they had for years before Mr. Rautiola was brought into

28

the fold) or from Defendants (who unlawfully utilized Plaintiff's intellectual property to complete with S&S).

In addition, Defendants have engaged in numerous other misleading practices that are unlawful under 15 U.S.C. § 1125(a)(1)(A).  More specifically, these acts include, and are far from limited to:  (1) misrepresenting to customers that S&S was bought out by another company; (2) misrepresenting to S&S sales members that S&S as a company no longer operates; (3) disallowing Loren from entering the Nartron premises where all S&S assets and equipment are located; (4) creating counterfeit copies of S&S products using S&S equipment; and (5) using S&S's intellectual property to create a new business that directly competes with S&S.  By using S&S's trademarks, Defendants specifically created confusion as to the affiliation, connection, or association between S&S and Defendants, and also impermissibly created confusion as to the origin of THP's goods, as well as to any customer perception that THP's products are sponsored by or approved by S&S.  Defendants' actions violates S&S's sole authority to decide how its trademarks will be used, and to control the quality of goods related to those marks.

Liability against Defendants is very clear under 15 U.S.C. § 1125(a)(1)(A).

## V.     DEFENDANTS ARE LIABLE UNDER THE LANHAM ACT FOR FEDERAL TRADEMARK COUNTERFEITING.

The Lanham Act prohibits the use of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale . . . of any goods or services [where] such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a).  To recover on a federal trademark counterfeiting claim, a plaintiff must show that: (1) the defendant infringed a registered trademark in violation of 15 U.S.C. § 1114; and (2) the defendant intentionally used the mark knowing it was a counterfeit as the term "counterfeit" is

defined in 15 U.S.C. § 1116. 15 U.S.C. § 1117(b); *Laukus v Rio Brands, Inc*, 391 F App'x 416, 425 (6th Cir. 2010).

Section 1116 defines "counterfeit mark" as a "mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered." 15 U.S.C. § 1116(d)(1)(B)(i). Elsewhere, the statute provides additional clarification, defining "counterfeit" as a spurious mark which is identical with, or substantially indistinguishable from, a registered mark. 15 U.S.C. § 1116(d)(1)(B)(ii).

In this case, there is no genuine issue of material fact whether Defendants are liable for federal trademark counterfeiting. First, Defendants are liable for trademark infringement under § 1114 for all the reasons set forth above. Second, Defendants intentionally took the Tattler logo and Tattler mark and used them in association with the production of canning lids identical to those produced by S&S, and then packaged and sold those canning lids in packaging which was - and still is - identical to S&S's packaging. This was done over the repeated objections by Loren, who was physically restrained from stopping these illegal acts. Defendants' liability is further confirmed through the fact that they have already admitted to using the same molding machine that S&S used for years before execution of the SPA. These molds contain the Tattler mark and Defendants, to this day, continue to use these marks outside of the S&S business. Liability against Defendants is straightforward under Count III of Plaintiff's First Amended Complaint.

VI.     **THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT DEFENDANTS ARE LIABLE UNDER 15 USC § 1125 FOR CYBERSQUATTING.**

As an amendment to the Lanham Act, 15 U.S.C. § 1125 prohibits "cybersquatting," or the online use of registered marks through bad faith. 15 U.S.C. § 1125(d)(1)(A).

In order to successfully establish a claim for violation of the statute, the Plaintiffs must show: (1) they have a valid trademark entitled to protection; (2) the mark is distinctive or famous; (3) the Defendants' domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's mark; and (4) the Defendants used, registered, or trafficked in the domain name (5) with a bad faith intent to profit. *Lucas Nursery & Landscaping, Inc v Grosse*, 359 F.3d 806, 809 (6th Cir. 2004)

As to the validity of S&S's trademark, S&S owns U.S. trademark registration number 5,787,373 for "TATTLER," which is registered on the Principal Register. *Exhibit 4*. 15 U.S.C. § 1115 states that "[a]ny registration . . . of a mark registered on the principal register . . . and owned by a party to an action shall be admissible in evidence and shall be prima facie evidence of the *validity* of the registered mark and of the registration of the mark, of the registrant's *ownership* of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein . . . ." Thus, S&S owns a valid trademark that is entitled to protection.

In addition, and as argued above regarding the strength of the mark, S&S's trademark for "TATTLER" is arbitrary or fanciful, and it is therefore inherently distinctive.

Third, Defendants' domain name of "tattlerproducts.com" is identical or confusingly similar to S&S's trademark "TATTLER." "Tattler" and "tattlerproducts" are nearly identical, and at a minimum they are very confusingly similar since they both include the dominant source-identifying term "TATTLER." The only difference between them is the addition of the generic term "products" in Defendants' domain name. Generic terms are not source identifiers under trademark law, *Nartron Corp v STMicroelectronics, Inc*, 305 F.3d 397, 404 (6th Cir. 2002), and therefore "tattler" and "tattlerproducts" are legally-equivalent terms under a trademark analysis.

31

Fourth, the Defendants own and operate a website at the domain name "tattlerproducts.com" which advertises and sells reusable canning lids in connection with the widespread display of S&S's Tattler trademark and logo.

Lastly, Defendants have carried out the actions described above with a bad faith intent to profit off S&S's goodwill established in its Tattler mark. As described at great length above, Defendants set out to deceptively gain control over S&S, its inventory, manufacturing equipment, and proprietary customer lists and information. Loren became aware of Defendants' ulterior motives and intent before giving up control of the S&S website to Defendants. And as a result, Defendants created their own website which illegally trafficked on the domain name "tattlerproducts.com," which is a cybersquatting violation under 15 U.S.C. § 1125.

## VII.   DEFENDANTS ARE LIABLE UNDER 17 USC § 101, *et seq*, FOR COPYRIGHT INFRINGEMENT.

Anyone who violates any of the exclusive rights enumerated in 17 U.S.C. § 106(1) granted to a copyright holder is liable for copyright infringement. 17 U.S.C. § 501(a). The prima facie case for copyright infringement has two elements. The first element requires proof of ownership of a valid copyright. *Feist Publications, Inc. v. Rural Tel. Serv. Co*., 499 U.S. 340, 361 (1991). This element is presumptively established by the copyright registration. *Lexmark Int'l, Inc. v. Static Control Components*, Inc., 387 F.3d 522, 534 (6th Cir. 2004) (abrogated on other grounds). A certificate made before or within five years after the author first publishes the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. 17 U.S.C. § 410(c).

The second element requires a showing that the defendant violated at least one of the exclusive rights granted to a copyright holder under 17 U.S.C. § 106. The six enumerated rights include the following:

> **(1)** to reproduce the copyrighted work in copies or phonorecords;
> **(2)** to prepare derivative works based upon the copyrighted work;

Here, S&S has copyright protection over all the contents of its website located online at www.reusablecanninglids.com. On December 5, 2018, S&S filed its application for copyright protection related to the "Tattler Reusable Canning Lids Website." With an effective date of December 5, 2018, the S&S website was registered with the United States Copyright Office, registration number TXu 2-115-949. *Exhibit 5.* S&S is the owner of this work and holds all rights to the website and its contents. As a result, the first element of copyright infringement is satisfied.

Additionally, Defendants violated several of the exclusive rights set forth in 17 U.S.C. § 106. First, Defendants violated the Company's exclusive right to reproduce the copyrighted work. To show a violation of the exclusive right of reproduction under § 106(1), the plaintiff must demonstrate the defendant copied "protectable elements of the work." *Lexmark*, 387 F.3d at 534; *Feist*, 499 U.S. at 361. A simple comparison between the S&S website (www.reusablecanninglids.com) and Defendants' website (www.tattlerproducts.com) makes it obvious that Defendants created an almost carbon-copy of extensive portions of Plaintiff's website. The scrolling banner on Defendants' page contains the same pictures as that of Plaintiff's website, and Defendants' website also contains identical testimonials from clients (a practical impossibility). In order to visually demonstrate the degree of copying and similarity, *Exhibit 27* shows various portions of S&S's website and the Defendants' website in a side-by-side comparison. These, among many other acts of copy and pasting, make it clear that Defendants, at the direction of Mr. Rautiola, violated Plaintiff's copyright protection over the content and substance of its website by the creation and use of www.tattlerproducts.com.

Second, Defendants' website, and arguably at best, could be considered a derivative of the original, protected work of Plaintiff's website. But only Plaintiff could have authorized the

creation and use of a website substantially similar to www.reusablecanninglids.com pursuant to 17 U.S.C. § 106(2). Derivative works are those "based upon one or more preexisting works." 17 U.S.C. § 101. "A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work.'" *Id.* Simply, S&S never consented to Defendants' website. In fact, Loren, acting on behalf of S&S repeatedly objected to Defendants' use of its intellectual property in any capacity. Thus, Defendants are liable under 17 U.S.C. § 106(2).

Additionally, liability is proper under 17 U.S.C. § 106(3). Pursuant to this section, Defendants are prohibited from distributing Plaintiff's copyrighted work without its permission. By virtue of Defendants' admission that they did not have consent to use or distribute Plaintiff's copyright-protected work, they are liable. Similarly, Defendants are also liable under 17 U.S.C. § 106(5) given the public nature of Plaintiff's website and domain name.

## CONCLUSION

Defendants' deliberate and blatant disregard for federal intellectual property laws is abundantly obvious and liability is clear. The merits of this case are quickly resolved through Defendants' admissions in this case. Simply, Defendants did not respond to these discovery requests, and the related admissions are dispositive of the factual and legal issues in this case. Second, no additional discovery is required because there is already a substantial amount of evidence establishing Defendants' liability. This Court should not condone Defendants' unlawful, deceptive, and guerilla-warfare business tactics designed to sink S&S Innovations Corp. and promote Mr. Rautiola's self-interested objectives. There is no genuine issue of material fact that Defendants are liable under Counts I-V of Plaintiff's First Amended Complaint and this Court should grant Plaintiff's motion pursuant to Fed. R. Civ. P. 56 as to all Defendants.

Dated: September 30, 2020                    KUIPER KRAEMER PC
                                             Attorney for Plaintiff

                                             By: /s/ Nicholas V. Dondzila
                                                  Nicholas V. Dondzila (P73937)

                                             BUSINESS ADDRESS AND TELEPHONE:
                                                  180 Monroe Avenue
                                                  Suite 400
                                                  Grand Rapids, MI 49503
                                                  (T): (616) 454-3700
                                                  dondzila@k2legal.com


Dated: September 30, 2020                    OPPENHUIZEN LAW PLC
                                             Attorney for Plaintiff

                                             By: /s/ David L. Oppenhuizen
                                                  David L. Oppenhuizen (P70219)

                                             BUSINESS ADDRESS AND TELEPHONE:
                                                  146 Monroe Center St NW
                                                  McKay Tower, Suite 730
                                                  Grand Rapids, MI 49503
                                                  (T) (616) 242-9550
                                                  david@oppenhuizen.com