UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

S&S INNOVATIONS CORP.,

     Plaintiff,

v.
                                   Case No. 1:18-cv-1377

UUSI, LLC, et al.,
                                   Honorable Hala Y. Jarbou

     Defendants.

_____/

## OPINION

Before the Court is Plaintiff S&S Innovations Corp.'s (S&S) motion for summary judgment.  (ECF No. 54.)  Each Defendant faces the same five claims.  Defendants are: (1) UUSI, LLC, doing business as Nartron; (2) Tattler Home Products, LLC (THP); and (3) Norman Rautiola, who is the managing member of Nartron and THP.  The five claims are for: (1) trademark infringement (Count I); (2) trademark counterfeiting (Count II); (3) unfair competition (Count III); (4) cybersquatting (Count IV); and (5) copyright infringement (Count V).  Plaintiff's motion was filed on September 30, 2020.  Defendants have not responded.  The deadline to do so has passed.  For the reasons below, the motion will be granted in part and denied in part.  The Court will grant summary judgment against THP with respect to Counts I-III and V.  The Court will grant summary judgment against Nartron with respect to Counts I-III.  Summary judgment will not be granted against Rautiola on any count.

# I.   Background

## A. Parties

S&S has two owners: Loren Stieg, an individual, and Defendant Nartron, a limited liability company.  (Pl.'s Br. in Supp. of Mot. for Summ. J., PageID.732.)  Stieg owns 51% of S&S's shares, while Nartron has a minority stake of 49%.  (*Id.*)  Defendant Rautiola is the managing member of Nartron.  (Stock Purchase Agreement, ECF No. 54-11, PageID.786.)  Rautiola also formed the final Defendant, Tattler Home Products, LLC, and serves as its managing member. (Articles of Organization, ECF No. 54-18.)

## B. Facts

### 1. Events leading to lawsuit

Stieg invented, designed, and began manufacturing reusable canning lids in 1976.  (Pl. Br. in Supp. of Mot. for Summ. J., PageID.721.)  He sold these products under the trade name "Tattler" and "Tattler Reusable Canning Lids."  In 2010, Stieg formed S&S with his son to carry on the Tattler business.  Stieg had a 51% stake in S&S, while his son had a 49% stake.  In 2014, Stieg sought to buy out his son and re-sell a minority stake in S&S.  Stieg found an interested buyer in Nartron.  The details of the transaction are a little complicated, but a brief sketch should suffice.  Some debt held by S&S had to be cleared before the sale to Nartron could be completed.  Rautiola, acting on behalf of Nartron, fronted the $170,000 needed to clear the debt.  With the debt out of the way, Stieg bought out his son and sold a 49% stake in S&S to Nartron.  The transaction concluded in March 2014.

This is where the trouble began.  Simply put, Rautiola and Nartron cut Stieg out of the business.  In April 2014, Rautiola formed THP and began to sell Tattler products through that company rather than through S&S.  Though THP would market and sell Tattler goods, the products themselves were manufactured by Nartron.  THP indisputably used S&S intellectual property in

its operations.  Stieg felt that THP was a usurpation of S&S and opposed THP's formation and operation.  He asserted that THP's business infringed S&S's intellectual property.  Rautiola countered that Nartron was the majority owner of S&S and thus had the power to permit THP to use S&S's intellectual property.  Rautiola believed that Nartron held a 66% stake in S&S by virtue of the $170,000 payment made to facilitate the March 2014 transaction.  A lawsuit was brought in state court to determine ownership of S&S, among other things.  In October 2017, the state court held that the $170,000 payment was a loan, not an equity purchase.  (12/31/2018 Op. & Order, ECF No. 8-7, PageID.279.)  Thus, Stieg, not Nartron, was confirmed as the majority owner of S&S.  Nartron and Rautioula could not have validly licensed S&S intellectual property to THP over Stieg's objection.

THP has continued to sell reusable canning lids bearing the name "Tattler" and to use other intellectual property owned by S&S.  Nartron has continued to manufacture Tattler products for THP.   THP and S&S also have competing websites.   S&S has a website at https://reusablecanninglids.com, where the Tattler logo is prominently featured and a variety of products bearing the Tattler name are for sale.   THP operates its website at https://tattlerproducts.com, which features the same Tattler logo and at least some of the same products as are found on the S&S site.  Rautiola personally directed the creation of THP's website, though his involvement in the site's design and implementation is unclear.

### 2. Conclusive and undisputed admissions made by Defendants

The following facts come from a series of requests for admissions served on Defendants. For reasons that will be fully explained later, Defendants never successfully contested these admissions, which are now incorporated in Plaintiff's unopposed motion for summary judgment. THP continues to use Tattler trademarks in the course of business and has done so without the consent of S&S.  It has sold and continues to sell products bearing the Tattler logo without the

consent of S&S.  THP has operated and continues to operate a website containing Tattler trademarks without the consent of S&S.  The images on THP's website were copied from S&S's website.  Stieg, the majority owner of S&S, objected to Defendants' use of the Tattler trademark, but Defendants did not cease their conduct.

### 3. Federal trademarks owned by S&S

In 2011, the United States Patent and Trademark Office (USPTO) registered the Tattler logo with S&S as the owner of Registration No. 4005734.  (ECF No. 54-6.)



*S&S Trademark Registration*

In November 2018, S&S filed a federal trademark application to trademark the word "Tattler" used in connection with "plastic lids."   The USPTO approved the application as Registration No. 5,787,373 in June 2019.  (ECF No.  54-8.)  Effective December 2018, S&S registered its website with the United States Copyright Office (registration number TXu 2-115-949), and S&S holds exclusive rights to the site and its contents.  (ECF No. 54-9.)  S&S also holds common law trademark rights in the Tattler name and logo.  The Tattler mark has been used in the manufacture and sale of the reusable canning lids designed by Stieg since the 1970s.

## II.  Standard

### A. Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must examine the "pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any," to determine whether there is a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P 56(c)) (internal quotations omitted).  A fact is material if it "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249 (citing *First Nat'l Bank. of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party [by a preponderance of the evidence], there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *City Serv.*, 391 U.S. at 289).  In considering the facts, the Court must draw all inferences in the light most favorable to the nonmoving party.  *Id.*  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Anderson*, 477 U.S. at 249.

### B. Failure to Respond to Motion for Summary Judgment

Local Rule 7.2(c) commands that "any party opposing a dispositive motion shall, within twenty-eight (28) days after service of the motion, file a responsive brief and any supporting materials."  W.D. Mich. L.Civ.R 7.2(c).  If the nonmoving parties fails to respond, the motion is treated as unopposed.  *See Tajaldeen v. Norwood*, No. 06-11764, 2007 WL 2081452 (E.D. Mich. July 17, 2007).  "'When a nonmoving party fails to respond to a summary judgment motion in the time frame set by the local rules, district courts in the Sixth Circuit have largely consider[ed] the [moving party's] statement of material facts to be undisputed for purposes of . . . summary judgment.'"  *Jones v. City of Franklin*, 677 F. App'x 279, 285 (6th Cir. 2017) (quoting *Simpson v. Bredesen*, No. 2:10-cv-02950-JPM, 2015 WL 5655999, at *4 (W.D. Tenn. Sept. 24, 2015)) (internal quotations omitted).

However, failing to respond to a summary judgment motion does not amount to default. "'A party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence of a material factual dispute always rests with the movant.'" *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630 (6th Cir. 2014) (quoting *Smith v. Hudson*, 600 F.2d 60, 64 (6th Cir. 1979)). "Even where a party 'offer[s] no timely response to [a] [] motion for summary judgment, the District Court [may] not use that as a reason for granting summary judgment without first examining all the materials properly before it under Rule 56(c).'" *Id.* (quoting *Smith*, 600 F.2d at 65).

In deciding an unopposed motion for summary judgment, courts may only consider the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Tr.*, 908 F.2d 399, 404 (6th Cir. 1992). "[A] district court is not required to search the record to determine whether genuine issues of material fact exist" for an unopposed summary judgment motion. *Willis v. Valley Residential Servs.*, No. 06-13686-BC, 2008 WL 1820892, at *4 (E.D. Mich. Apr. 22, 2008) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989)). It is "utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the [unopposed] motion." *Guarino*, 908 F.2d at 406.

### III. Analysis

Defendants have admitted to committing the violations alleged by S&S. Prior to the lawsuit, it was already settled that Stieg, not Nartron, was the majority owner of S&S. Thus, S&S could not permit any person or entity to use its intellectual property without Stieg's consent. On June 16, 2020, Plaintiff served a request for 36 admissions on Defendants. Under Federal Rule of Civil Procedure 36(a)(3), Defendants had 30 days to respond to Plaintiff's requests. On July 17,

2020, a day late,[1] Defendants improperly filed their responses on the court docket.  *See* Fed. R. Civ. P. 5(d)(1)(A) (responses to requests for admission "must not be filed until they are used in the proceeding or the court orders [such] filing").  The Court struck the filing from the record. (ECF No. 42.)  Plaintiff states that Defendants never attempted to properly serve their responses. (Pl.'s Br. in Supp. of Mot. for Summ. J., PageID.733 n.2.)  A request for admission is considered admitted when the party served fails to timely respond.  Fed. R. Civ. P. 36(a)(3).  To date, Defendants have not filed a motion to set aside their admissions.

Even if Defendants' untimely and improper response could still be considered valid, their failure to oppose Plaintiff's motion for summary judgment renders the question moot.  Plaintiff reasserts the facts unintentionally admitted by Defendants in its motion for summary judgment under a heading titled "UNDISPUTED FACTS THAT ESTABLISH LIABILITY AS TO ALL DEFENDANTS."  (Pl.'s Br. in Supp. of Mot. for Summ. J., PageID.721.)  In that section, S&S also states that "Defendants admitted to violating Plaintiff's intellectual property rights, [and] admitted that they do not have S&S's consent to use the trademarks or copyright."  (*Id.*)  Because Plaintiff's motion is unopposed, the Court will treat these assertions as undisputed facts.  *Jones*, 677 F. App'x at 285.  As a result of Defendants' admissions, Plaintiff is almost tautologically entitled to summary judgment on some of its claims.  Nevertheless, the Court will analyze each claim to confirm that S&S has satisfied the obligations imposed by Rule 56(c) and is entitled to judgment as a matter of law. The following facts are decisive:

(1)  Defendants used (and continue to use) Plaintiff's intellectual property;
(2)  Plaintiff has objected to Defendants' use of its intellectual property;
(3)  Defendants have no legal right to use Plaintiff's intellectual property;
(4)  Plaintiff never otherwise consented to the use of its intellectual property;
(5)  Defendants have created and sold counterfeit S&S products that contain S&S intellectual property;

---

[1] The document containing the responses was dated July 16, 2020, but the document itself was not filed until the next day.  (ECF No. 41.)

7

     (6) Defendants unlawfully copied the S&S website in creating their website;

     (7) Defendants have used (and continue to use) S&S intellectual property in commerce; and

     (8) Defendants have directly competed with S&S using intellectual property owned by S&S.

(Pl.'s Br. in Supp. of Mot. for Summ. J., PageID.734.)

Finally, it may be helpful to clarify the relationships between the three defendants to explain why summary judgment will be granted against some Defendants on some claims but not against others. Rautiola is the managing member of Nartron. Nartron claimed to be the majority owner of S&S and thus had authority to license S&S's intellectual property to other entities. This is exactly what Nartron purported to do with THP. THP was organized by Rautiola, who is also its managing member. Much of Plaintiff's case involves establishing infringement by THP. Nartron is liable for such infringement since it purports to have the power to license S&S's intellectual property to THP and manufactures the infringing products sold by THP.

Plaintiff ultimately misses the mark in trying to impose liability on Rautioula. Though he plays a major role in the operation of THP and Nartron, there are few facts in evidence showing that Rautiola directly participated in any infringing actions. The closest Plaintiff comes is by asserting that Rautiola personally directed THP to register its website. However, his involvement in the actual design and appearance of the site is unclear. While corporate officers can be personally liable if they actively participate in infringement, mere control over an infringing company is insufficient.[2] *Hair Assocs., Inc. v. Nat'l Hair Replacement Servs., Inc.*, 987 F. Supp. 569 (W.D. Mich. 1997). Ultimately, there is not enough evidence regarding Rautiola's actions to grant summary judgment on the claims against him.

---

[2] Plaintiff does not argue that THP and Nartron are mere alter egos of Rautiola, which would justify piercing the corporate veil.

### A. Trademark Infringement

The Lanham Act permits two theories of liability for alleged infringers of federal trademarks. The first is direct infringement, where "the defendant is using a mark to identify its goods that is similar to the plaintiff's trademark." *Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 695 (6th Cir. 2003).  Next, contributory liability may imposed on anyone that knowingly facilitates direct infringement.  *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 503 (6th Cir. 2013) (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844 (1982)).  S&S asserts that THP is a direct infringer of its intellectual property, while Rautiola and Nartron are liable for contributing to THP's direct infringement.

The Lanham Act authorizes owners of registered trademarks to pursue infringement claims under 15 U.S.C. § 1114.  "The touchstone of liability is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).  Eight factors help courts determine likelihood of confusion:

> (1) strength of the senior mark;
>
> (2) relatedness of the goods or services;
>
> (3) similarity of the marks;
>
> (4) evidence of actual confusion;
>
> (5) marketing channels used;
>
> (6) likely degree of purchaser care;
>
> (7) the intent of defendant in selecting the mark; and
>
> (8) likelihood of expansion of the product lines.

*Id.* (citing *Frisch's Restaurants, Inc. v. Elby's Big Boy, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982)).

Not every factor will bear on every case, and the factors "imply no mathematical precision," but the "ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1997). The Court finds that the factors 1-3 and 5-7 unquestionably favor Plaintiff. The Court is less convinced that the fourth and final factor favors S&S, but that alone cannot overcome the weight of the other factors.

### 1. Strength of trademarks favors Plaintiffs

The first factor turns on a trademark's distinctiveness and its recognition by the public. "A mark is strong if it is highly distinctive, i.e. if the public readily accepts it as the hallmark of a particular source." *Homeowners Grp.*, 931 F.2d at 1107 (internal quotations omitted). "The stronger the mark, all else equal, the greater the likelihood of confusion." *Id.* Public recognition "can occur when the mark is unique, when it has received intensive advertisement, or both." *Daddy's Junky Music*, 109 F.3d at 280. Distinctiveness and public recognition are given separate consideration in evaluating the overall strength of a mark. *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012). Distinctiveness is measured in terms of "conceptual strength," while public recognition is weighed by "commercial strength." *Id.* (internal quotations omitted).

### a. Conceptual strength

Conceptual strength "depends partly upon which of four categories [the mark] occupies: generic, descriptive, suggestive, and fanciful or arbitrary." *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 631 (6th Cir. 2002) (internal quotations omitted). The latter two categories are considered "inherently distinctive and are protectable so long as the putative owner has actually used the mark." *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 761-62 (6th Cir. 2005). "Fanciful and arbitrary marks are the strongest. *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*,

78 F.3d 1111, 1117 (6th Cir. 1996).   "'An "arbitrary" mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached,' such as CAMEL cigarettes or APPLE computers."   *Id.* (quoting *Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir. 1987)).   On the other hand, "'[a] "fanciful" mark is a combination of letters or other symbols signifying nothing other than the product or service to which the mark has been assigned,' such as EXXON or KODAK."   *Id.* (quoting *Little Caesar*, 834 F.2d at 571).

Plaintiff argues that the Tattler logo is both arbitrary and fanciful.   The Court finds that the logo is arbitrary but not fanciful.   The Oxford English Dictionary provides the following definitions of tattler: "1. One who tattles; and idle talker, a chatterer; a gossip; a talebearer, telltale. 2. A striking watch, a repeater; a watch in general.   3.  Any of the sandpipers of the genus *Totanus* or subfamily Totaninæ; so called from their vociferous cry."   *Tattler*, Oxford English Dictionary (2d ed. 1989).   Hence, "tattler" is a word "with recognized meaning in everyday speech," *Daddy's Junky Music*, 109 F.3d at 281, but the above definitions do not have any inherent connection with reusable canning lids.   That makes the logo arbitrary.   The Tattler logo has great conceptual strength.

### b.  Commercial strength

A conceptually strong mark may still be considered weak overall if it is not also commercially strong.   *Progressive Distrib. Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 430 (6th Cir. 2017).   "Survey evidence is the most persuasive evidence of commercial recognition. . . . [But] it is by no means a requirement.   Proof of marketing may be sufficient to support a finding of broad public recognition."   *Id.* (internal quotations omitted).   Other than the news article in the Traverse City Record-Eagle, Plaintiff points to no evidence of marketing.   It also did not provide any survey evidence.

11

This paucity of evidence might move the first factor against Plaintiff.  But S&S points out that the Tattler logo has been trademarked since 2011.  "[O]nce a mark has been registered for five years, the mark must be considered strong and worthy of full protection."  *Wynn Oil Co. v. Thomas*, 839 F.3d 1183, 1187 (6th Cir. 1988).  That protection does not apply to a registered mark that has been "successfully challenged within five years of registration." *Id.* at 1186-87.  Defendants began using the Tattler logo as early as April 2014, but S&S's ownership of its intellectual property was never challenged, only the ownership of S&S itself was.  Moreover, to the extent Defendants made any challenge to S&S's registered trademark, it was not successful.  The Tattler logo has been registered since 2011 and not been subject to fruitful challenge.  It is entitled to protection even if the commercial strength prong is weak for S&S.  The first factor favors Plaintiff.

### 2. Relatedness of the goods or services favors Plaintiff

The second factor pegs likelihood of confusion to the relatedness of the challenged good and allegedly protected good and the degree to which the parties compete.  Confusion is most likely to result where the parties are in direct competition and "the marks are sufficiently similar." *Daddy's Junky Music*, 109 F.3d at 282.  Relatedness exists where "the [goods] are marketed and consumed such that buyers are likely to believe that the [goods], similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *Homeowners Grp.*, 931 F.2d at 1109; *see also Wynn Oil*, 839 F.2d at 1187 (relatedness exists where goods are similar enough that a consumer could "easily assume" that they were offered by the same source).

Here, S&S and THP are directly competing with each other by selling the same products.  This factor favors Plaintiff.

### 3. Similarity of the marks favors Plaintiff

With respect to the third factor, "courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently

similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark." *Daddy's Junky Music*, 109 F.3d at 283 (internal quotations omitted).  "When analyzing similarity, courts should examine the pronunciation, appearance, and verbal translation of conflicting marks." *Id.* Confusion is more likely to result when the marks are more similar.  *See id.*

Here the marks are virtually identical.  Both Plaintiff and Defendants use the same Tattler logo.  The sole difference is that S&S's Tattler logo has the name "Stieg" written vertically on the left end of the logo.  *See* https://reusablecanninglads.com (last visited Dec. 28, 2020).  The Tattler logo on THP's website does not include Stieg's name.  *See* https://tattlerproducts.com (last visited Dec. 28, 2020).  This difference is minimal and may be missed if not pointed out.  S&S and THP use functionally the same mark and this factor therefore favors Plaintiff.

### 4. Evidence of actual confusion favors neither party

The fourth factor asks whether there is evidence of consumer confusion between the two products.  "Evidence of *actual* confusion is undoubtedly the best evidence of *likelihood* of confusion." *Daddy's Junky Music*, 109 F.3d at 284 (internal quotations omitted) (emphasis added). However, "[d]ue to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant, and the factors of actual confusion is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available." *Id.* (internal quotations omitted).  "Nonetheless, isolated instances of confusion after a significant period of time of concurrent sales or extensive advertising do not always indicate an increased likelihood of confusion and may even suggest the opposite." *Id.* "Where the parties have been doing business in the same area for some time and where they have advertised extensively, isolated incidents of actual confusion are not conclusive or entitled to great weight in the determination." *Homeowners Grp.* 931 F.2d at 1110.

Plaintiff puts forth three exhibits allegedly demonstrating customer confusion.  (ECF Nos. 54-25 to 54-27.)  Each exhibit features a customer contacting S&S and being redirected to THP.[3] One of the exhibits does not truly demonstrate confusion – a company attempts to collect on an invoice for S&S and is told that THP will assume the invoice.  (ECF No. 54-26.)  The other two exhibits demonstrate genuine confusion between S&S and THP.  Considering that S&S and THP are directly competing, one might expect there to be even more evidence of confusion.  Though the circumstances are unusual – this case grew from a dispute about who owned S&S – the Court finds that Plaintiff has put forward paltry evidence of actual confusion considering that S&S and THP compete with each other.  This factor does not favor either party but is not fatal to S&S's claims: "a successful Lanham Act plaintiff only must show a sufficient *potential* of confusion, not actual confusion." *Daddy's Junky Music*, 109 F.3d at 284.

### 5. Marketing channels used favors Plaintiff

The fifth factor "consists of considerations of how and to whom the respective goods or services are sold." *Homeowners Grp.*, 931 F.2d at 1110.  Confusion is more likely to result where the parties have the same predominant customers and market through similar media in similar contexts. *Id.*

THP essentially holds itself out as the successor to S&S and seeks to continue relationships with preexisting customers.  (*See* ECF Nos. 54-26, 54-12.)  Both companies sell to retailers and both company's websites are tailored for sale to individual customers.  (*See* ECF No. 54-26; https://tattlerproducts.com; https://reusablecanninglids.com.)  The respective "Testimonials" page on THP's and S&S's websites feature the same effusive messages of individual customer

---

[3] Plaintiff states that ECF No. 54-25 is a customer inquiry from September 2014 regarding Tattler lids purchased in 2011.  (Pl. Br. in Supp. of Mot. for Summ. J. 23.)  In fact, the cited exhibit is an email chain from a customer contacting S&S seeking fulfilment of an order apparently placed with THP in March 2014.

14

satisfaction with Tattler canning lids.  In the facts section of their motion, S&S also states that THP's business is built on and marketed through customer lists originally belonging to S&S.[4]  (Pl. Br. in Supp. of Mot. for Summ. J. 12.)  Plaintiff and Defendants are targeting the same customers through the same channels.  This factor favors S&S.

### 6. Likely degree of purchaser care favors Plaintiff

The sixth factor focuses on the degree of discriminating caution that would be exercised by the ordinary customer of the products in question.  *Therma-Scan*, 295 F.3d at 636-37.  Courts should expect "[a] higher degree of care . . . where the buyer in question has a particular expertise or sophistication, or is making an expensive or unusual purchase."  *Id.*  The greater care expected, the less likely confusion is to result.  *Id.*  "Courts have adopted the general proposition that the average customer is likely not to exercise a high degree of care in purchasing relatively inexpensive and fungible products."  *Gray v. Meijer, Inc.*, 295 F.3d 641, 651 (6th Cir. 2002).

Both THP and S&S offer a variety of reusable lid packages for under $10. http://tattlerproducts.com/Store/index.html; https://reusablecanninglids.com/products.  Given that the products offered by both companies are relatively inexpensive, the average customer is not expected to exercise a great degree of care in purchasing canning lids.  This factor favors Plaintiff.

### 7. Defendants' intent in selecting its mark favors Plaintiff

"If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity."  *Homeowners Grp.*, 931 F.2d at 1111. "[T]he use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying."  *Daddy's Junky Music*, 109 F.3d at 286.

---

[4] As mentioned earlier, because Defendants failed to respond to Plaintiffs motion for summary judgment, the statement of facts in Plaintiff's motion will be treated as undisputed.

Defendants knew that the Tattler logo was protected and belonged to S&S.  As previously stated, the entire basis of the THP company and business was that Nartron controlled S&S and thus could have S&S permit THP to use its intellectual property.  As it turns out, Nartron is not the majority owner of S&S.  It lacked authority to permit THP's use of S&S's intellectual property.  THP has continued to use the Tattler logo even after it was determined that Stieg, not Nartron, controlled S&S.  Defendants knowingly used a protected mark that they had no right to use.  This factor favors Plaintiff.

### 8. Likelihood that product lines will expand does not favor either party

The last factor asks whether one party is expected to expand its business to compete with the other or whether the parties will begin to market to overlapping customer bases.  "A geographic expansion or an increase in the types of products or services offered can be relevant."  *Id.* at 287.

Plaintiff points to evidence that Defendants intend to "add other home kitchen products" to THP's suite of offerings.  (ECF No. 54-13; *see also* THP Articles of Organization (THP formed for the "sale and manufacture of kitchen products").)  The Court does not see how THP's expansion into product lines untouched by S&S could cause confusion about the Tattler logo.  An increase in the types of products offered is only relevant to the extent that it could increase competition between the parties.  *See Homeowners Grp.*, 931 F.2d at 1112 ("Inasmuch as a trademark owner is afforded greater protection against services that directly compete . . . a 'strong possibility' that either party will expand his business to compete with the other . . . will weigh in favor of finding that the present use is infringing.").  THP would not be expanding into any new product lines that would compete with S&S.

Plaintiff also argues that "under COVID-19 conditions, people may be more inclined to stay home and store food for a later date," which presents an expansion opportunity for both S&S and THP.  (Pl.'s Br. in Supp. of Mot. for Summ. J. 27.)  Without more concrete evidence, this

16

assertion is too vague to be considered on a motion for summary judgment.  The final factor does not favor the Plaintiff.

### 9. Defendants THP and Nartron are liable for trademark infringement

Having analyzed the eight factors and finding that all but the fourth and last favor Plaintiff, the Court concludes that S&S prevails on Count I against THP and Nartron.  "The touchstone of liability is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties."  *Daddy's Junky Music*, 109 F.3d at 280.  Plaintiff has presented evidence sufficient to demonstrate that there is no genuine dispute of material fact regarding THP's unpermitted use of the Tattler logo and the harm it inflicts on S&S through potential customer confusion.  It is undisputed that Nartron manufactured the infringing products for THP.  This makes Nartron liable as a contributory infringer.  2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:18 (5th ed. 2019) (citing *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844 (1982) (contributory trademark infringement where party continues to supply products to a known infringer)).  THP and Nartron have infringed on S&S's trademark and Plaintiff is entitled to judgment as a matter of law on Count I.  Though Rautiola manages both Nartron and THP and helped license THP as an LLC in Michigan, there is insufficient evidence of his personal involvement in any infringing activities.  Summary judgment will be denied on Count I with respect to Rautiola.

### B. Federal Trademark Counterfeiting

The Lanham Act states that:

(1) Any person who shall, without the consent of the registrant –

    (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, mistake, or to deceive . . .

shall be liable in a civil action by the registrant.

15 U.S.C. § 1114(a).

A successful federal trademark counterfeiting claim establishes two elements: "(1) [that] the defendant infringed a registered trademark in violation of 15 U.S.C. § 1114; and (2) [that] the defendant intentionally used the mark knowing it was a counterfeit as the term counterfeit is defined in 15 U.S.C. § 1116." *Laukus v. Rio Brands, Inc.*, 391 F. App'x 416, 425 (6th Cir. 2010) (citing 15 U.S.C. § 1117(b)). "Counterfeit" is defined as

> (i) a counterfeit of a mark that is registered on the principal register in the [USPTO] for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark so registered; or

> (ii) a spurious designation that is identical with, or substantially indistinguishable from [a registered mark].

15 U.S.C. §§ 1116(d)(1)(B)(i-ii).

Plaintiff has established a federal trademark counterfeiting claim.  For the reasons given in Section III.A, S&S has proven that THP and Nartron infringed a registered trademark – the Tattler logo – in violation of 15 U.S.C. § 1114.  Plaintiff further established that THP and Nartron knew the Tattler logo was registered to S&S yet continued to use the logo on THP products.  THP's Tattler logo is a counterfeit of a registered trademark.  Because S&S has met both elements of the claim, the Court will grant summary judgment in favor of Plaintiff on Count II against THP and Nartron.[5]  As discussed in Section III.A, Plaintiff has not established that Rautiola infringed a registered trademark.  The Court will not grant summary judgment on Count II against Rautiola.

---

[5] Although there is no case in the Sixth Circuit that directly addresses the issue, the District of New Hampshire interpreted a Sixth Circuit opinion to determine that contributory infringers can be liable for federal trademark counterfeiting.  *Coach, Inc. v. Sapatis*, 27 F. Supp. 3d 239, 248 (D.N.H. 2014) (citing *Goodfellow*, 717 F.3d at 503).

### C. Unfair Competition

The Lanham Act imposes liability for unfair competition when:

(1) Any person who, in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1)(A).

Section 1125 provides plaintiffs with a channel to sue for infringement of a trademark that is unregistered but recognized at common law. *Parameter Driven Software, Inc. v. Mass. Bay Ins. Co.*, 25 F.3d 332, 337 (6th Cir. 1994). Plaintiff brings a "false designation of origin" claim under section 1125 based on THP's use of the Tattler logo. S&S is entitled to summary judgment on this claim. With respect to a false designation of origin claim,

The essential elements . . . are as follows:

(1) ownership of a specific service mark in connection with specific services; (2) continuous use of the service mark; (3) establishment of a secondary meaning if the mark is descriptive; and (4) a likelihood of confusion amongst customers due to the contemporaneous use of the parties' service marks in connection with the parties' respective services.

*Allard Enterprises, Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 355 (6th Cir. 1998) (internal quotations omitted).

The first element is met here because Stieg began referring to his reusable canning lids as "Tattler" in 1976. "[O]wnership is not acquired by federal or state registration. Rather, ownership rights flow from prior appropriation and actual use in the market." *Homeowners Grp.*, 931 F.2d at 1105. The right to use the word Tattler was assigned to S&S when it was founded by Stieg in 2010. The second element is met because S&S has been using the word Tattler to refer to reusable

canning lids since its creation, and prior to any use by Defendants.  The third element is satisfied because Tattler is an arbitrary mark, and arbitrary marks do not require proof of secondary meaning to enjoy legal protection.  McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:12 (5th ed. 2019) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992)).  The fourth element is subject to the same likelihood of confusion test applied in Count I.  The Court found a likelihood of confusion with respect to the trademark infringement claim and therefore the final element is met.  THP sells infringing Tattler products, and Nartron manufactures them.  Both companies are liable.  *See Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 793 (6th Cir. 2015) (contributory infringers are liable for false designation of origin claims).  Plaintiff is entitled to summary judgment on Count III against Nartron and THP.  There is insufficient evidence to grant summary judgment against Rautiola.

### D. Cybersquatting

The Lanham Act also prohibits "cybersquatting," "the Internet version of a land grab." *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 267 (4th Cir. 2001).  Essentially, the law targets those who do not own a particular well-known brand but nevertheless register Internet domain names indicating that brand name in order to force the brand's true owners into purchasing the registered domain names at extortionate prices.  *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 809 (6th Cir. 2004).  A defendant is liable to the owner of a protected mark if the defendant:

> (i) has a bad faith intent to profit from that mark . . . and;
>
> (ii) registers, traffics in, or uses a domain name that—
>
>> (I) in the case of a mark that is distinctive at the time of the registration of the domain name, is identical or confusingly similar to that mark . . . .

15 U.S.C. §§ 1125(d)(1)(A)(i-ii).

While true that THP runs a competing website that infringes on S&S's Tattler logo, Plaintiff has not made out a cybersquatting claim.

"The paradigmatic harm that the [cybersquatting provision] was enacted to eradicate [is] the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark." *Lucas Nursery & Landscaping*, 359 F.3d at 810.  This interpretation is borne out by the factors suggested by the statute when assessing bad faith.  The first four factors relate to whether the alleged cybersquatter had any legitimate purpose in registering the challenged domain name.  15 U.S.C. §§ 1125(d)(1)(B)(i)(I-IV).  The next five factors focus on indicia of malintent, such as whether the defendant's purpose was to harm the goodwill represented by the mark, offers to sell the domain name to the mark owner, whether defendant provided false contact information when registering the domain name, and acquisition of multiple domain names that are similar to the mark in question.  *Id.* at §§ 1125(d)(1)(B)(i)(V-IX).

Plaintiff has not put forward any evidence suggesting that, by registering tattlerproducts.com, Defendants intended to coerce payment from S&S.  Based on the record, it appears that Defendants were trying to do something else entirely: present THP as the legitimate manufacturer and purveyor of Tattler products.  It may not be legal for them to do so, and their conduct may subject them to liability on other grounds, but their actions do not suggest an intent to extract value from S&S by tarnishing the Tattler brand or squatting on a domain name that should rightfully belong to S&S.  Plaintiff has not established the kind of bad faith required by the cybersquatting provision.  S&S is not entitled to summary judgment on Count IV.

### E. Copyright Infringement

In Count V, Plaintiff alleges that THP's website infringes on S&S's website, which is subject to a registered copyright protection.  (ECF No. 54-9.)

17 U.S.C. § 501(a) provides that "[a]nyone who violates any of the exclusive rights of the copyright owner as provided by [17 U.S.C. § 106(1)] . . . is an infringer of the copyright."  The statute also confers on copyright holders a cause of action to pursue infringement.  *Id.* at § 501(b). To succeed on a claim for copyright infringement, the holder must prove that he owns a valid copyright and that the defendant violated one of the exclusive rights of copyright holders under 17 U.S.C. § 106.  *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

A registrant of a copyright is presumptively the owner of the registered copyright.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 534 (6th Cir. 2004).  Plaintiff has established the first element because it has shown that its website has been registered with the United States Copyright Office.  (ECF No. 54-9.)

Two exclusive rights of copyright holders enumerated in 17 U.S.C. § 106 are the right to reproduce the copyrighted work in copies and the right to prepare derivative works based upon the copyrighted work.  17 U.S.C. §§ 106(1)-(2).  Plaintiff argues that THP's website is "an almost carbon-copy of extensive portions of Plaintiff's website."  (Pl. Br. in Supp. of Mot. for Summ. J. 33.)  S&S provides an exhibit giving purported side-by-side comparisons of the two websites, and they show a striking similarity.  (ECF No. 54-31.)  Plaintiff does not indicate exactly when the screenshots were taken.  But even today, THP's website uses some of the exact same images (some of which also bear the Tattler logo), text, and customer testimonials as are featured on S&S's copyrighted website.  *Compare* https://reusablecanninglids.com (last visited Dec. 28, 2020) *with* https://tattlerproducts.com (last visited Dec. 28, 2020).  THP's website as a whole is also derivate of S&S's website.  "A 'derivative work' is a work based upon one or more preexisting works . . . [a] work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole represent an original work of authorship, is a 'derivative work.'"  17 U.S.C. § 101.

Plaintiff has established the two elements required to prove its copyright infringement claim.  There is no genuine dispute that S&S owns a copyright to its website, and that THP's website uses that copyrighted material on its own site.  Plaintiff is entitled to summary judgment against THP on Count V.  Rautiola may have directed the registration of the website, but there is no indication that he had any hand in the site's design or implementation.  There is no evidence establishing Nartron's connection to the creation of the infringing website.  Summary judgment on Count V will be denied with respect to Nartron and Rautiola.

## IV. Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment will be granted in part.  The motion will be granted against all Defendants with respect to Counts I-III and V.  It will be denied with respect to Count IV.  An order will enter consistent with this opinion.


Dated:   January 4, 2021                               /s/ Hala Y. Jarbou
                                                       HALA Y. JARBOU
                                                       UNITED STATES DISTRICT JUDGE